UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RUPAN CHAKMA, SULOY TRIPORA, TAPAN KANTI TANCHANGYA, TIYANIT KAEWPAN, and PRAMITA CHAKMA, *on behalf of themselves and others similarly situated*,

                     Plaintiffs,

          -v.-

SUSHI KATSUEI, INC., *d/b/a* SUSHI KATSUEI PARK SLOPE; ROYAL KATSUEI, INC., *d/b/a* SUSHI KATSUEI WEST VILLAGE; AYE AYE SWE; and AUNG KO WIN,

                     Defendants.

---

23 Civ. 7804 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiffs brought this class action against Sushi Katsuei, Inc., Royal Katsuei, Inc., Aye Aye Swe, and Aung Ko Win (collectively, "Sushi Katsuei" or "Defendants"), alleging various labor law violations. Before the Court now is Plaintiffs' motion for sanctions, a motion predicated on numerous missteps by Defendants and their counsel since the Court granted Plaintiffs' class certification motion. *See generally Chakma* v. *Sushi Katsuei, Inc.*, No. 23 Civ. 7804 (KPF), 2025 WL 429730 (S.D.N.Y. Feb. 7, 2025) ("*Sushi Katsuei I*"). For the reasons explained below, the Court grants in large part Plaintiffs' motion for sanctions.

*First*, the Court orders Defendants to pay Class Counsel's attorneys' fees associated with multiple instances of discovery misconduct in the amount of $46,980. *Second*, the Court orders Defendants to pay Class Counsel's costs in

the amount of $781.88.  *Third*, the Court orders Defense Counsel to pay Class Counsel's attorneys' fees associated with Defense Counsel's use of improper authority and generative AI in the amount of $1,710.  *Fourth*, the Court imposes a $1,000 monetary penalty on Defense Counsel for the same.

## BACKGROUND

### A.    The Court's Decision in *Sushi Katsuei I*

On February 7, 2025, the Court issued an Opinion and Order certifying a Class and a Subclass in this case.  *See Sushi Katsuei I*, 2025 WL 429730, at *14.  (*See* Dkt. #60).  The Class includes "all tipped food-service employees other than sushi chefs who worked for Defendants at the Sushi Katsuei restaurants at any time on or after September 1, 2017."  *Sushi Katsuei I*, 2025 WL 429730, at *4 (internal quotation marks omitted).  The Subclass includes "tipped food-service employees (other than sushi chefs) at SK Park Slope, who were subject to Defendants' tip-pooling system, at any time on or after September 1, 2017."  *Id.*  Now, Plaintiffs seek sanctions arising from three sets of actions that Defendants and Defense Counsel took after the Court decided *Sushi Katsuei I*.  The Court discusses each in turn.

### B.    The Sanctionable Conduct of Defendants and Their Counsel

#### 1.    Defendants' Delayed Production of the Class List and Classwide Payroll Records

The first category of misconduct pertains to Defendants' delay in producing discovery in the form of a class list and classwide payroll records.  By way of background, in *Sushi Katsuei I*, the Court ordered Defendants to produce on or before March 15, 2025, a "list of all class members' and subclass

2

members' names, dates of employment, last known addresses, and last known phone numbers" (the "Class List"). *Sushi Katsuei*, 2025 WL 429730, at *14. Compliance with that order proved difficult for Defendants.

On March 17, 2025, two days after the deadline set in *Sushi Katsuei I*, Defendants sought an extension of time to produce the Class List. (Dkt. #61). The Court granted that extension but noted that the request came *after* the initial production deadline and warned that no further extensions would be granted. (Dkt. #64). On April 14, 2025, Defendants purportedly provided the Class List, but Plaintiffs later informed the Court that the Class List included only Class Members who worked at Defendants' restaurants through September 2023, despite the fact that the Class and the Subclass certified by the Court included no such limitations. (Dkt. #69; *see also* Dkt. #132 ("Def. Opp.") at 5 (explaining that Plaintiffs' submission listed an incorrect date)).

Consequently, Plaintiffs moved for sanctions. (Dkt. #69). Responding via endorsement on May 5, 2025, the Court expressed its concern that Defendants had not complied with various orders. (Dkt. #71). But it denied without prejudice Plaintiffs' request for sanctions. (*Id.*). To facilitate Defendants' compliance with their production obligations, the Court explicitly set a February 7, 2025 end date for the class period; gave Defendants until May 9, 2025, "to produce a complete class list"; and warned that "[i]f Defendants[ ] yet again fail to comply with the Court's deadlines, Plaintiffs[ ] are welcome to renew their application for sanctions." (*Id.*).

Six days after that deadline, on May 15, 2025, Plaintiffs informed the Court that the updated Class List lacked the phone numbers of Class Members. (Dkt. #73). In addition, Plaintiffs shared that Defendants had yet to produce classwide payroll records despite having a deadline of May 5, 2025, to do so. (*Id.*). Expressing its "dismay[ ]," the Court ordered Defendants to produce an updated Class List and all outstanding discovery by May 29, 2025. (Dkt. #74). Additionally, the Court ordered Defendants to submit a sworn certification from all Defendants confirming that they had produced all responsive classwide payroll documents in their possession. (*Id.*).

Defendants' gamesmanship again got in the way of compliance with the Court's orders. Specifically, they produced paychecks for some Class Members but no tip records, and their certifications reflected the same. (Dkt. #79). Accordingly, on June 16, 2025, the Court ordered Defendants to produce by June 23, 2025, (i) any existing documents related to tips and (ii) revised certifications indicating that they had produced all payroll and tip records, not merely paychecks. (Dkt. #81).

Defendants did not produce the required information by the deadline, and Plaintiffs filed a motion to compel and for discovery sanctions on June 24, 2025. (Dkt. #86). In response, the Court once again stated that it was "dismayed by Defendants' continued failure to comply with discovery orders and Defendants' total disregard for the deadlines imposed by this Court." (Dkt. #89). The Court noted that it had "generously granted multiple extensions of discovery deadlines in an effort to facilitate Defendants' compliance with its

4

directives," but "[i]ts patience ha[d] worn thin," and it struggled "to credit any of Defendants' representations." (*Id.*). Accordingly, the Court ordered Defendants to show cause in writing on or before July 10, 2025, "as to why sanctions should not be imposed on Defendants and defense counsel, up to and including the entry of a default judgment, for their continued failure to comply with Court orders." (*Id.*).

The day after the Court's deadline, Defendants filed their response to the Order to Show Cause. (Dkt. #96). In their response, Defendants asked the Court not to impose a default. (*Id.*). Despite having missed multiple document production deadlines, Defendants requested an extension to produce documents "*for the last chance, within 30 day[s].*" (*Id.*). Four days later, Defendants filed a declaration from Defendant A. Swe. (Dkt. #100). In the declaration, A. Swe explained that her failure to provide the required information stemmed from her and her co-Defendants "simply trying to operate each of [their] own restaurants, often with limited time to attend even to our own personal well-being or family responsibilities." (*Id.* ¶ 6). The declaration reiterated the request for an additional 30 days to produce the necessary documents. (*Id.* ¶ 23).

On July 18, 2025, the Court filed an endorsement, noting that it "shares Plaintiffs' outrage at Defendants' continued disregard for this Court's instructions." (Dkt. #102). The Court further reminded Defendants that their complete production was "long overdue," and remarked that it was "not at all persuaded by Defendants' attempts to justify their delay." (*Id.*). Further

discussion of Defendants' conduct would take place at a September 16, 2025 hearing. (*Id.*). Four days before the hearing, however, the parties informed the Court that Defendants had provided Plaintiffs with affidavits stating that no additional responsive documents existed. (Dkt. #113). In light of these representations, Plaintiffs sought no additional documents. (*Id.*).

### 2. Defendants' Agents' Communications with Class Members

The second category of relevant conduct relates to improper communications between Defendants or their agents and Class Members. On or around May 30, 2025, Class Counsel mailed notices of the class action to approximately 75 Class Members. (Dkt. #88). In June 2025, two Class Members contacted Class Counsel to inform them that a manager at Defendants' restaurant named Maya Swe had been pressuring them to opt out of the case. (*Id.*). By late June 2025, Class Counsel had received 31 requests to be excluded from the class, an unusually high opt-out rate in the experience of both Class Counsel and the Court. (*Id.*). Consequently, Plaintiffs wrote to the Court on June 26, 2025, (i) to notify the Court of M. Swe's actions and (ii) to request an evidentiary hearing in advance of an anticipated motion to void the exclusion requests. (*Id.*).

On July 1, 2025, Defendants responded and included a sworn declaration from M. Swe that denied Plaintiffs' allegations and denied that Defendants A. Win and A. Swe had any involvement in or knowledge of M. Swe's communications with Class Members. (Dkt. #91, 91-1). The next day, the Court explained that it "expect[ed] Defendants and M. Swe to immediately

cease from engaging in conduct that could be perceived ... to obstruct or contravene Court orders," and it warned "that any further impermissible communications with class members ... will almost certainly lead to sanctions." (Dkt. #92).

The next day, Plaintiffs notified the Court that they had been informed that another one of Defendants' employees, K. Tun, was pressuring Class Members to opt out at the behest of M. Swe. (Dkt. #93). Accordingly, Plaintiffs requested an evidentiary hearing to determine whether exclusions requests should be voided and a corrective notice disseminated to the Class. (*Id.*). Plaintiffs also requested that the Court permit them to take certain discovery from Defendants and their agents. (*Id.*). Defendants responded on July 8, 2026. (Dkt. #94).

On July 9, 2025, the Court granted Plaintiffs' request for a hearing. (Dkt. #95). The Court ordered Defendants A. Swe and A. Win, as well as their employees M. Swe and K. Tun, to appear at the hearing. (*Id.*). In the meantime, the Court instructed these individuals to produce to Class Counsel (i) affidavits identifying every class member to whom they had spoken about the lawsuit since February 7, 2025, (ii) lists of all Class Members' phone numbers in their possession, and (iii) all written communications with Class Members since February 7, 2025. (*Id.*). Finally, the Court instructed M. Swe to turn over her call logs since May 1, 2025. (*Id.*).

Plaintiffs later informed the Court that Defendants produced affidavits from Defendants A. Swe and A. Win the day after the Court's deadline. (Dkt.

#104).  But Defendants failed to produce M. Swe's call logs, a list of Class Members' phone numbers in Defendants' or their agents' possession, or K. Tun's declaration.  (*Id.*).  Defendants only provided a declaration from M. Swe (*id.*), in which she claimed not to know who qualified as a Class Member despite working at Defendants' restaurants for the entirety of the class period (Dkt. #103-1).

Acknowledging their noncompliance, Defendants explained that they had "made every effort to comply with the Court's [July 9, 2025] Order," but they could not because they were busy with work, family matters, and a settlement conference.  (Dkt. #104).  In response, the Court recognized "that Defendants have competing work and family obligations."  (Dkt. #105).  Nonetheless, the Court noted that it was "not persuaded" by Defendants' justifications, especially given that Defendants (i) had never sought extensions of the relevant deadlines and (ii) had "displayed a pattern of disregard for this Court's orders and their discovery obligations more broadly."  (*Id.*).  The Court closed by ordering Defendants to produce all outstanding material on or before August 1, 2025.  (*Id.*).

Following a now-familiar script, Defendants failed to fully comply with the Court's order by the August 1, 2025 deadline, leading Plaintiffs to request a conference on the matter.  (Dkt. #106).  The Court granted that request.  (Dkt. #107).  Defendants later responded by claiming compliance with the Court's order, but their response admitted that certain material in the possession of nonparties M. Swe and K. Tun had not been produced.  (Dkt. #110).  In direct

contravention of the Court's previous orders, Defendants asserted that they had "no obligation to produce documents" in M. Swe's and K. Tun's possession. (*Id.*).  Furthermore, Defendants called the request for M. Swe's call logs "overbroad and improper," despite the fact that they had not raised such an argument when the Court initially ordered the call logs' production.  (*Id.*).

On August 15, 2025, the Court held a telephonic conference to address the matter in advance of the evidentiary hearing that the Court had previously scheduled.  (*See* August 15, 2025 Minute Entry; Dkt. #111).  At the conference, the Court rejected Defendants' argument that they had no control over Ms. Swe's communications with Class Members, explaining that "at the very least, [Defendants] should have obtained from Ms. Swe all of her text messages or e-mails … regarding company business."  (Dkt. #111 at 16:21-17:3).  It was "not an acceptable answer" to say that M. Swe's communications to Class Members were not in Defendants' possession because Defendants "either enacted or allowed to exist a policy by which Ms. Swe was a point person for communications with employees."  (*Id.* at 17:4-17:9; *see also id.* at 17:10-18:22 (rejecting Defendants' arguments to the contrary)).  Defendants ultimately acknowledged that certain call logs should have been produced and had not been.  (*Id.* at 23:9-25:24).

Next, Defendants attempted to walk back M. Swe's statements that she did not know the Class Members, explaining that she may have misunderstood the concept of a class member.  (Dkt. #111 at 25:25-28:25).  Defense Counsel ultimately admitted that M. Swe's sworn statements were likely false.  (*Id.* at

30:1-32:9 ("I don't believe that [M. Swe] doesn't know who class members are at all.")). Consequently, the Court gave Defendants yet another extension in the form of one additional week to provide any remaining discovery or corrected sworn statements. (*Id.* at 49:6-49:10).

Taking a step back, the Court recognized the "enormous expenditure of resources by both plaintiffs' counsel and [the Court] to get [Defendants] to comply with [directives] that [they] should have complied with in the first instance." (Dkt. #111 at 34:21-35:1). On September 12, 2025, four days before the previously scheduled evidentiary hearing, the parties informed the Court that Defendants had agreed (i) to invalidate all exclusion requests received by putative Class Members by that date and (ii) to allow Plaintiffs to send out corrective notice to Class Members who had previously opted out. (Dkt. #113).

### 3.    Defendants' Use of Improper Authority

The final category of conduct relevant to Plaintiffs' sanctions motion pertains to legal authority on which Defense Counsel relied in her submissions to the Court. Specifically, on July 15, 2025, Plaintiffs brought to the attention of the Court that Defendants had fabricated legal authority in at least two submissions to the Court. (*See* Dkt. #101 (alerting the Court to Defendants' improper citations)).

The most egregious examples appeared in Defendants' July 8, 2025 letter regarding their interference with the class notice process. There, Defendants cited Federal Rule of Civil Procedure 23 and *OConner* v. *Agilant Solutions, Inc.,*

444 F. Supp. 3d 593 (S.D.N.Y. 2020), for the proposition that text messages from K. Tun could not establish misconduct by Defendants because they were inadmissible hearsay.  (Dkt. #94).  But Rule 23 concerns class actions, and *OConner*'s relevance is therefore limited because it discusses when a court may enjoin an employer-defendant from contacting putative class members through a protective order.  *See* 444 F. Supp. 3d at 606-07.

In that same letter, Defendants again cited *OConner*, as well as *Haider* v. *Lyft, Inc.*, No. 20 Civ. 2997 (AJN), 2021 WL 3475621 (S.D.N.Y. Aug. 6, 2021), to argue that "communications by independent third parties cannot be attributed to defendants absent clear evidence of an agency relationship" (Dkt. #94).  But *Haider* and *OConner* have nothing to do with agency law, and neither discusses when a third party's communications can be attributed to defendants.  *See Haider,* 2021 WL 3475621, at *2-3 (discussing a district court's "discretion to restrict communications between parties and absent class members"); *OConner,* 444 F. Supp. 3d at 606-07 (similar).  Defendants cite these cases repeatedly throughout the July 8, 2025 letter, each time incorrectly.  (Dkt. #94).  At another point in the letter, Defendants cite to "§ 3.01 Certification Is Crucial Step In Class Actions," with no indication as to the source of such authority.  (*Id.*).

On September 16, 2025, the Court held a hearing to discuss, among other things, these improper citations.  (*See* September 16, 2025 Minute Entry; Dkt. #120).  At the hearing, Defense Counsel acknowledged that she had used LexisNexis's AI tool to help construct multiple submissions to the Court and

11

then failed to review the final versions for correctness.  (Dkt. #120 at 23:12-23:16, 25:20-26:5).  And she recognized that certain of the citations, including to "§ 3.01," resulted from AI hallucinations.  (*Id.* at 29:19-30:3).

The Court expressed skepticism that Defense Counsel's sole impropriety consisted of failing to review the submissions, noting that in the July 8, 2025 letter, "there's no case that [Defendants] cit[ed] that actually stands for the proposition" that it is used to support.  (Dkt. #120 at 29:4-29:12).  The Court, looking at Defendants' letters filed on July 1, 2025, July 8, 2025, and July 11, 2025, noted that "all of the cases that are cited seem to be irrelevant to the points that [Defendants] rais[ed]."  (*Id.* at 31:6-31:9).

At the hearing, Defense Counsel maintained that she had not filed unchecked AI-generated submissions outside of this case.  (Dkt. #120 at 34:6-35:1).  And she explained that her oversight in this case resulted from some personal challenges that had taken up much of her time.  (*Id.* at 35:4-37:4).  Nonetheless, given the blatant errors in the submissions, the Court found it "troubling" that Defendants had "never tried to fix" the submissions and had "never acknowledged these mistakes until [the Court] had to convene a court hearing."  (*Id.* at 37:14-39:3).  Defense Counsel responded that she "was not … in the right mind."  (*Id.* at 37:24-38:1).  Defendants did not seek to replace their submissions until January 21, 2026, over six months after Defendants' original filings, and only after Plaintiffs raised these same concerns in the instant sanctions motion.  (*See* Dkt. #133 (Defendants' request to replace the

submissions); Dkt. #125 ("Pl. Br.") at 19 (Plaintiffs' brief noting that Defendants "have done nothing" to "remedy the false submissions")).

## C.    The Instant Motion

Taking all of the above into account, the Court set a briefing schedule at the September 16, 2025 hearing for Plaintiffs to file a motion for sanctions. (*See* September 16, 2025 Minute Entry).  On November 13, 2025, Plaintiffs filed their motion for sanctions and supporting papers.  (Dkt. #124-126). Defendants filed their opposition and supporting papers on January 13, 2026. (Dkt. #131-132).  Plaintiffs filed their reply on January 26, 2026, thus concluding the briefing on the instant motion.  (Dkt. #134).  In short, Plaintiffs ask the Court (i) to order Defendants and Defense Counsel to pay Class Counsel's attorneys' fees and costs associated with the above conduct, and (ii) to impose a monetary penalty for submitting false citations.  (Pl. Br. 17-23).

## DISCUSSION

## A.    Sanctions Determination

### 1.    Applicable Law

#### a.    Sanctions Under Federal Rule of Civil Procedure Rule 37

The Second Circuit has confirmed that "a district court 'has wide discretion to impose sanctions for abusing' the discovery process."  *Bilodeau* v. *Usinage Berthold, Inc.*, No. 24-299-cv, 2025 WL 1778857, at *3 (2d Cir. June 27, 2025) (summary order) (quoting *Kyros Law P.C.* v. *World Wrestling Ent., Inc.*, 78 F.4th 532, 545 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 822 (2024)).

Federal Rule of Civil Procedure 37 allows the Court to impose discovery sanctions in multiple contexts, two of which are relevant here.

*First*, Rule 37(a) applies when a party files a motion to compel. The Rule provides that if such a "motion is granted — or if the disclosure or requested discovery is provided after the motion was filed — the court *must* … require the party … whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion." Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). But the Court "must not" impose such sanctions if "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.*

*Second*, Rule 37(b) concerns a party's failure to comply with a court order, and it provides that when "a party … fails to obey an order to provide or permit discovery … the court … may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Indeed, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

Several considerations inform the Court's analysis of a motion for sanctions under Rule 37, including: "[i] the willfulness of the non-compliant

14

party or the reason for noncompliance; [ii] the efficacy of lesser sanctions; [iii] the duration of the period of noncompliance[;] and [iv] whether the noncompliant party had been warned of the consequences of noncompliance." *Agiwal* v. *Mid Island Mortg. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Nieves* v. *City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)); *accord Doe* v. *Delta Airlines Inc.*, 672 F. App'x 48, 50 (2d Cir. 2016) (summary order) (discussing the *Agiwal* factors).  The Second Circuit has characterized the imposition of reasonable expenses and attorneys' fees as "[t]he mildest" of the sanctions that Rule 37 authorizes.  *Cine Forty-Second St. Theatre Corp.* v. *Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979); *accord Ritchie Risk-Linked Strategies Trading (Ir.), Ltd.* v. *Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012).

> **b.    Sanctions Under the Court's Inherent Powers and 28 U.S.C. § 1927**

In addition to the authority provided by Rule 37, a district court has the "inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct."  *Sussman* v. *Bank of Isr.*, 56 F.3d 450, 459 (2d Cir. 1995); *see also Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) ("[A] court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" (quoting *Alyeska Pipeline Serv. Co.* v. *Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975))); *Int'l Techs. Mktg., Inc.* v. *Verint Sys., Ltd.*, 991 F.3d 361, 367-68 (2d Cir. 2021) (discussing a district court's inherent power).

On top of this inherent power, 28 U.S.C. § 1927 authorizes a court to require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously ... to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927; *see also Madison 92nd St. Assocs., LLC* v. *Marriott Int'l, Inc.*, No. 13 Civ. 291 (CM), 2013 WL 5913382, at *12 (S.D.N.Y. Oct. 31, 2013) ("The purpose of § 1927 is 'to ensure that those who create unnecessary costs also bear them.'" (quoting *O'Rear* v. *Am. Fam. Life Assurance Co. of Columbus, Inc.*, 144 F.R.D. 410, 413 (M.D. Fla. 1992)), *aff'd sub nom., Boies, Schiller & Flexner LLP* v. *Host Hotels & Resorts, Inc.*, 603 F. App'x 19 (2d Cir. 2015) (summary order).

Unlike in the Rule 37 context, to impose sanctions under Section 1927 or a district court's inherent power, the court must find "clear evidence that the conduct at issue is [i] entirely without color and [ii] motivated by improper purposes." *Wolters Kluwer Fin. Servs., Inc.* v. *Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009); *see generally Sorenson* v. *Wolfson*, 683 F. App'x 33, 36-37 (2d Cir. 2017) (summary order) (discussing sanctions imposed under the inherent powers doctrine and 28 U.S.C. § 1927).  Regarding the first prong, "[c]onduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Scivantage*, 564 F.3d at 114 (citing *Schlaifer Nance & Co.* v. *Est. of Warhol*, 194 F.3d 323, 337 (2d Cir. 1999)).

16

The second prong requires the district court to find bad faith, which requires a high degree of factual specificity in most cases.  *See United States* v. *Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000); *Oliveri* v. *Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986).  Under this requirement, sanctions are appropriate only "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *Oliveri*, 803 F.2d at 1273; *see also Int'l Techs. Mktg., Inc.*, 991 F.3d at 367-68.

### 2.    Defendants Must Pay Most of Class Counsel's Fees Related to Securing Defendants' Production of the Class List and Classwide Payroll Records

As discussed, multiple disputes arose following the Court's directive that Defendants produce the Class List and classwide payroll records.  Plaintiffs now seek an award of attorneys' fees and costs incurred in litigating those disputes.  (Pl. Br. 17-18).  The Court awards fees to Plaintiffs, but only with respect to disputes that arose after May 5, 2025.

As discussed above, Plaintiffs' initial motion to compel, filed April 24, 2025, relayed the fact that Defendants' initial Class List included only people who worked at Defendants' restaurants through September 2023.  (Dkt. #69).  The motion sought production of a revised Class List that included people who worked at the restaurants through 2025.  (*Id.*).  On May 5, 2025, the Court granted the motion but declined to impose sanctions because it recognized that, read most charitably, there may have been confusion about the end date of the class period.  (Dkt. #71).  It subsequently set the end date of the class

17

period as February 7, 2025, the day class certification was granted, and ordered Defendants to produce all required materials — both the Class List and payroll documents — on or before May 9, 2025.  (*Id.*).

Returning to this dispute in the context of the instant motion, the Court again declines to impose sanctions because of Defendants' potentially justifiable confusion.  In short, Defendants had a colorable justification for not producing the complete Class List before Plaintiffs filed their April 24, 2025 motion to compel.  *See* Fed. R. Civ. P. 37(a)(5)(A)(ii) (noting that a court must not order the payment of attorneys' fees if a party's discovery nondisclosure "was substantially justified").

The Court reaches a different conclusion regarding all disputes arising thereafter.  In its May 5, 2025 Order, the Court warned that "[i]f Defendants[ ] yet again fail to comply with the Court's deadlines, Plaintiffs[ ] are welcome to renew their application for sanctions." (Dkt. #71).  Yet on May 15, 2025, Plaintiffs informed the Court that Defendants had provided a Class List that lacked Class Members' phone numbers, contrary to the Court's clear instructions, and that certain payroll records remained outstanding.  (*See* Dkt. #73).  Defendants acknowledge that such material had not been produced. (*See* Def. Opp. 6 (explaining that Defendants produced the outstanding documents on May 29, 2025, and May 30, 2025)).

Afterward, Defendants produced paychecks for some Class Members, but no tip records, so Plaintiffs again moved to compel.  (Dkt. #79).  On June 16, 2025, the Court granted the motion and gave Defendants until June 23, 2025,

18

to produce the remaining material.  (Dkt. #81).  But again, Defendants failed to make the necessary production.  (Dkt. #86).  Like clockwork, Plaintiffs moved to compel (Dkt. #86), which motion the Court granted on June 26, 2025, after noting "Defendants' total disregard for the deadlines imposed by this Court" (Dkt. #89).  Plaintiffs filed no further motions to compel on the issue before the parties confirmed that all discovery had been produced.  (Dkt. #113).

Given this course of events, the Court orders Defendants to pay Class Counsel's fees related to disputes memorialized in Plaintiffs' motions to compel that were filed on May 15, 2025 (Dkt. #73), June 12, 2025 (Dkt. #79), and June 24, 2025 (Dkt. #86).  *See* Fed. R. Civ. P. 37(a)(5)(A), 37(b)(2)(C).  In fact, the Court "must" reach this conclusion because Defendants' attempts to justify their actions are wholly unpersuasive, so no "circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(a)(5)(A).

As to the discovery disputes that arose after May 5, 2025, Defendants' only explanation was that they had "limited time" to comply with the discovery orders given their busy personal and professional lives.  (Dkt. #100 ¶ 6; *see also* Def. Opp. 12 (making similar excuses of "family-related issues and defendant's illness")).  The Court remarked then — and reiterates now — that it is "not at all persuaded by Defendants' attempts to justify their delay."  (Dkt. #102).  The Court is skeptical because Defendants routinely allowed deadlines to pass without seeking extensions and without contemporaneously informing the Court of scheduling challenges.  (*See* Dkt. #105 (explaining Defendants' problematic tendencies of "disregard[ing] the Court's explicit instructions and

19

comply[ing] [only] as they see fit")).  This prompted Plaintiffs to file various motions with the Court and caused unnecessary delay in the litigation.

Defendants also try to avoid sanctions by arguing that their discovery errors were "not a result of willful noncompliance" and "not based on bad-faith."  (Def. Opp. 6, 13).  But that is irrelevant under Rule 37.  "Although severe sanctions under [Rule 37], such as dismissal of the action, can generally be imposed only upon a showing of willfulness or bad faith … , monetary damages may be awarded for discovery abuses or failures, even absent bad faith."  *Thai Lao Lignite (Thai.) Co., Ltd.* v. *Gov't of the Lao People's Democratic Republic*, No. 10 Civ. 5256 (KMW), 2011 WL 4111504, at *8 (S.D.N.Y. Sep. 13, 2011) (citing *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066 & n.8).  Consequently, the Court imposes sanctions in the form of attorneys' fees and costs that Plaintiffs incurred after May 5, 2025, to effectuate Defendants' production of the Class List and payroll records.  *See* Fed. R. Civ. P. 37(a)(5)(A), 37(b)(2)(C); *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066.

**3.    Defendants Must Pay Class Counsel's Fees Related to Communications Between Defendants' Agents and Class Members and the Subsequent Voiding of Opt-Outs**

Plaintiffs next seek attorneys' fees related to the improper communication between Defendants or their agents and Class Members, and Plaintiffs' subsequent successful effort to void Class Members' opt-outs.  (Pl. Br. 18-19).  The Court awards fees to Plaintiffs for the entirety of this dispute.

The problem began when Plaintiffs became aware that M. Swe and K. Tun engaged in improper communication with Class Members.  Plaintiffs

20

subsequently informed the Court about such communication (Dkt. #88, 93), and the Court issued an order on July 9, 2025, instructing named Defendants A. Swe and A. Win, as well as nonparties M. Swe and K. Tun, to provide (i) affidavits identifying every class member they had spoken to about this lawsuit since February 7, 2025, (ii) lists of all Class Members' phone numbers in their possession, and (iii) all written communications with Class Members since February 7, 2025 (Dkt. #95).  The July 9, 2025 Order also instructed M. Swe to turn over her call logs dating back to May 1, 2025.  (*Id.*).

Defendants did not produce all the required materials, again providing excuses that the Court found unpersuasive.  (Dkt. #103-105).  Perhaps even more disturbing, among the documents that Defendants did produce was a declaration from M. Swe that Defense Counsel later admitted was misleading, if not outright false.  (Dkt. #111 at 30:1-32:9).

In response to Defendants' noncompliance, the Court gave Defendants a new deadline — August 1, 2025 — to comply with the Court's July 9, 2025 Order, but that deadline came and went.  (Dkt. #105-107).  Later, Defendants acknowledged their noncompliance with the Court's July 9, 2025 Order but claimed that they had "no obligation" to ensure M. Swe's and K. Tun's compliance.  (Dkt. #110; *see also* Dkt. #111 at 23:9-25:24 (acknowledging that, contrary to their earlier statements, certain materials should have been produced)).  Notably, Defendants had not made such an argument previously to the Court, nor had they requested any amendment to the July 9, 2025 Order.  (*See* Dkt. #104 (making only a vague statement on July 24, 2025, that

21

"Defendants and/or their Counsel have no control over the third-party, Ms. Mya Swe," but affirming that Defendants were in contact with her)).  Only after a conference on the matter did Defendants agree to invalidate the opt-outs and allow Plaintiffs to send out corrective notices.  (Dkt. #113).

In sum, Defendants or their agents M. Swe and K. Tun interfered with the class notice process to such a degree that Class Counsel had to seek the intervention of the Court to secure the integrity of that process.  Under such circumstances, "Plaintiffs' counsel are also entitled to costs, including attorneys' fees reasonably incurred in uncovering, proving, and applying for relief from [the defendant's] misconduct." *Tedesco* v. *Mishkin*, 629 F. Supp. 1474, 1486 (S.D.N.Y. 1986); *see id.* (noting that, as here, when the defendant interfered with the notice process, "extensive hearings and testimony required to bring these matters to conclusion … could have been eliminated if [the defendant] and his counsel in good faith had stipulated to known facts"); *see also Romano* v. *SLS Residential, Inc.*, 253 F.R.D. 292, 299-300 (S.D.N.Y. 2008) (ordering the payment of attorneys' fees and the issuance of corrective notice after voiding opt-outs because the defendant improperly interfered in the notice process).

Defendants argue that they should not be on the hook for Plaintiffs' fees related to this dispute for multiple reasons.  *First*, they argue that sanctions are inappropriate because Defendants themselves did not contact Class Members about opting out.  (Def. Opp. 14-15).  In support, Defendants point to certain cases where district courts have declined to intervene when there was

no evidence that opt-outs resulted from the defendant's conduct.  (*See id.* (citing, among others, *Chime* v. *Peak Sec. Plus, Inc.*, No. 13 Civ. 470 (AMD) (PK), 2016 WL 3440593, at *3 (E.D.N.Y. June 20, 2016))).

But these cases do not capture the situation here because, as discussed at the August 15, 2025 conference, M. Swe and K. Tun were acting as Defendants' agents when they contacted Class Members.  The record makes clear that at the very least, M. Swe is a manager at Defendants' restaurants who is responsible for communicating with Class Members on behalf of Defendants.  (*See* Dkt. #88; Dkt. #111 at 16:21-18:22 (rejecting Defendants' argument because Defendants "either enacted or allowed to exist a policy by which Ms. Swe was a point person for communications with employees")).

"[W]hen a manager acts as an agent for a corporate employer," as here, the manager's "actions may be attributed to a corporate entity for FLSA purposes."  *Keawsri* v. *Ramen-Ya Inc.*, No. 17 Civ. 2406 (VEC), 2018 WL 279756, at *4 (S.D.N.Y. Jan. 2, 2018) (collecting cases).  "So long as the manager or supervisor had actual supervisory authority over the plaintiff and acted in the course of his or her employment … , the manager is an agent of the plaintiff's employer."  *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2004 WL 725969, at *4 (S.D.N.Y. Apr. 2, 2004).  This is at least true with respect to M. Swe, who communicated with employees on behalf of Defendants, if not also K. Tun.  Consequently, Defendants cannot avoid sanctions for M. Swe's or K. Tun's actions on the basis that they are not named Defendants.

*Second*, Defendants suggest that after being alerted about the "alleged improper communication, they agreed to void the opt-outs and send[ ] corrective notices without causing any delay in the case." (Def. Opp. 15). That assertion strains credulity. As Plaintiffs point out, between June 2025 and September 2025, the Court (i) issued multiple orders instructing Defendants to produce sworn statements from them and their agents about their communications with Class Members and (ii) held two conferences to discuss the issue. (Pl. Reply 5). Defendants repeatedly ignored the Court's orders and did not agree to void the improper opt-outs until September 12, 2025, on the eve of the second conference and over two months after Plaintiffs brought the issue to the attention of the Court. (Dkt. #113). Defendants cannot on this record avoid sanctions on a theory of cooperation or acceptance of responsibility.

*Third,* Defendants posit that their actions were taken without bad faith. (Def. Opp. 15). But, as explained above, bad faith is not necessary to award sanctions for discovery violations. *See Thai Lao Lignite (Thai.) Co.*, 2011 WL 4111504, at *8; *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1066. And nearly all of the relevant misconduct involved failing to produce material that the Court ordered Defendants to produce, thus necessitating the filing of multiple motions to compel. Consequently, bad faith is not necessary to award sanctions for much of this dispute.

To be sure, some of the conduct, including the initial communications between Defendants' agents and Class Members, may not in and of itself

24

amount to a discovery violation.  But to the extent that bad faith is required to impose sanctions for that conduct, it is present here.  Defendants' agents met with Class Members, whom they supervised at work, and pressured them to opt out of the Class.  (Dkt. #88, 93).  This conduct is "entirely without color" and could not be motivated by anything other than an "improper purpose" of undermining Plaintiffs' case.  *Scivantage*, 564 F.3d at 114.  For this reason, courts have found bad faith and awarded attorneys' fees when presented with similar conduct by defendants.  *See, e.g., Tedesco*, 629 F. Supp. at 1486; *Romano*, 253 F.R.D. at 299-300.  The Court does the same here.

### 4.    Defense Counsel Must Pay Class Counsel's Fees Related to Defense Counsel's Use of Improper Authority

Finally, Plaintiffs seek attorneys' fees related to litigation over Defense Counsel's use of improper authority in certain submissions to the Court. Looking at three of Defense Counsel's letters, the Court noted that all cited cases "seem to be irrelevant to [Defendants'] points." (Dkt. #120 at 31:6-31:9). And some citations were entirely hallucinated.  (*Id.* at 29:19-30:3).  Indeed, Defense Counsel admitted to submitting false authority and to misapplying case law.  (*Id.* at 23:12-23:16, 25:20-26:5, 29:19-30:3).  Yet despite these admissions, Defense Counsel did not seek to replace the false submissions until over six months later, and only when Plaintiffs raised this exact concern in their motion for sanctions.  (*See* Dkt. #133).

Defense Counsel's action caused Class Counsel to have to uncover and respond to Defense Counsel's false submissions.  Given this pattern, the Court holds that Defense Counsel must pay the fees that Class Counsel incurred in

litigating Defense Counsel's false submissions.  *See Byoplanet Int'l, LLC* v. *Johansson*, 792 F. Supp. 3d 1341, 1357 (S.D. Fla. 2025) (ordering an attorney to pay attorneys' fees to opposing counsel "for all time spent responding to any filing in which generative AI was used to develop hallucinated cases and fabricated quotations").

As before, Defense Counsel attempts to avoid sanctions by arguing that she did not use AI in bad faith. (Def. Opp. 15-16).  Instead, she asserts that her use of AI resulted from "her oversight" and was not "an intentional attempt to mislead the Court or cause delay in the proceeding." (*Id.* at 15).  That oversight, she explains, resulted from certain extraordinary personal circumstances, including harassment that required police intervention and the issuance of multiple orders of protection,. (*Id.*).

The Court sympathizes with Defense Counsel's personal challenges, but it believes that her use of generative AI without the necessary checks nonetheless constitutes bad faith.  Indeed, "courts in this circuit have repeatedly found that presenting AI-generated hallucinations as valid caselaw constitutes subjective bad faith." *Braica* v. *Frankowski*, — F. Supp. 3d —, No. 3:24 Civ. 1709 (VDO), 2025 WL 3644231, at *4 (D. Conn. Dec. 15, 2025) (collecting cases).

As in those cases, Defense Counsel here made "misleading representation[s]" to the Court "for an improper purpose." *Rankin* v. *City of Niagara Falls*, 293 F.R.D. 375, 387 (W.D.N.Y. 2013), *aff'd*, 569 F. App'x 25 (2d Cir. 2014) (summary order).  "Namely, [s]he made no attempts to check

whether h[er] AI-generated [letters] were accurate, and [s]he used these misleading hallucinations to advance h[er] case." *Braica*, 2025 WL 3644231, at *6. The Court thus imposes sanctions in the form of attorneys' fees and costs for Defense Counsel's use of improper authority. Having determined that attorneys' fees are warranted, the Court next decides the reasonable amount.

## B.   Reasonable Attorneys' Fees

### 1.   The Lodestar Method of Awarding Attorneys' Fees

Attorneys' fees are typically awarded by determining the "presumptively reasonable fee," often (if imprecisely) referred to as the "lodestar." *Millea* v. *Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53 (2010); *Rossbach* v. *Montefiore Med. Ctr.*, No. 19 Civ. 5758 (DLC), 2021 WL 4940306, at *1 (S.D.N.Y. Oct. 22, 2021) ("When a court imposes a monetary sanction against a party in the amount of its adversary's attorneys' fees, the familiar lodestar method is used to calculate the appropriate sum."), *aff'd in part and vacated in part on other grounds*, 81 F.4th 124 (2d Cir. 2023). The lodestar is calculated by multiplying the "reasonable hourly rate and the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.

Courts may, only after the initial calculation of the presumptively reasonable fee, adjust the total when it "does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Lilly*

v. *City of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Millea*, 658 F.3d at 167).[1]  A district court possesses considerable discretion in awarding attorneys' fees.  *See Millea*, 658 F.3d at 166; *Arbor Hill*, 522 F.3d at 190.

"To determine the reasonable hourly rate for each attorney, courts must look to the market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  *Heng Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *2 (S.D.N.Y. May 8, 2007) (quoting *Gierlinger* v. *Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)).  The Second Circuit's "forum rule" requires courts to "generally use the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee."  *Simmons* v. *N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Arbor Hill,* 493 F.3d at 119).

---

[1]    The Second Circuit confirmed in *Lilly* v. *City of New York*, 934 F.3d 222 (2d Cir. 2019), that while this Circuit has adopted the lodestar approach for fee determinations, the 12 factors set forth in *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by*, *Blanchard* v. *Bergeron*, 489 U.S. 87 (1989) — which articulated a competing method for fee determinations — "remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted."  *Lilly*, 934 F.3d at 233. These 12 factors are: (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the level of skill required to perform the legal service properly; (iv) the preclusion of employment by the attorney due to acceptance of the case; (v) the attorney's customary hourly rate; (vi) whether the fee is fixed or contingent; (vii) the time limitations imposed by the client or the circumstances; (viii) the amount involved in the case and results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *County of Albany*, 522 F.3d 182, 186 n.3 (2d Cir. 2008) (citing *Johnson*, 488 F.2d at 717-19).

"A district court has discretion to determine a reasonable hourly rate based on considerations such as the complexity of the case, the prevailing rates in similar cases in the district, and the quality of representation." *Pasini* v. *Godiva Chocolatier, Inc.*, 764 F. App'x 94, 95 (2d Cir. 2019) (summary order) (citing *Townsend* v. *Benjamin Enters., Inc.*, 679 F.3d 41, 59 (2d Cir. 2012)); *accord Lilly*, 934 F.3d at 231-32. In this setting, "the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Bliven* v. *Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (internal quotation marks omitted) (quoting *DiFilippo* v. *Morizio*, 759 F.2d 231, 236 (2d Cir. 1985)).

When determining the reasonable number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam)). In addition, the court should examine the hours expended by counsel with a view to the value of the work product to the client's case. *See Lunday*, 42 F.3d at 133-34. The court is to exclude "excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims." *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). Where "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent." *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks omitted) (quoting *Alveranga* v. *Winston*, No. 04 Civ. 4356 (ARR) (CLP), 2007 WL 595069, at *5 (E.D.N.Y. Feb. 22, 2007)); *see also Fox* v. *Vice*, 563 U.S. 826, 838 (2011) (observing that "[t]he essential goal in shifting fees … is to do rough justice, not to achieve auditing perfection"). A court retains the discretion to make across-the-board percentage reductions to exclude unreasonable hours, colloquially referred to as "trimming fat." *E.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *accord McDonald ex rel. Prendergast* v. *Pension Plan of the NYSA-ILA Pension Tr. Fund*, 450 F.3d 91, 96 (2d Cir. 2006).

The burden is on the fee applicant — here, Plaintiffs — to "document[ ] the appropriate hours expended and hourly rates." *Dancy* v. *McGinley*, 141 F. Supp. 3d 231, 235 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Hensley* v. *Eckerhart*, 461 U.S. 424, 437 (1983)). Requested fees "must be supported with contemporaneous time records establishing for each attorney

for whom fees are sought, the date on which work was performed, the hours expended, and the nature of the work done." *Abdell* v. *City of New York*, No. 05 Civ. 8453 (RJS), 2015 WL 898974, at *2 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks omitted) (quoting *Sprint Commc'ns Co. L.P.* v. *Chang*, No. 13 Civ. 3846 (RA), 2014 WL 6611484, at *6 (S.D.N.Y. Nov. 21, 2014)). "[C]ounsel … [are] not required to record in great detail how each minute of [their] time was expended," but "counsel should identify the general subject matter of [their] time expenditures." *Hensley*, 461 U.S. at 437 n.12.

### 2.    The Court Awards Reasonable Attorneys' Fees and Costs

#### a.    Reasonable Hourly Rates

Here, Plaintiffs seek fees for work performed by three attorneys: Maimon Kirschenbaum, Josef Nussbaum, and Denise Shulman, each a partner at Joseph & Kirschenbaum LLP.  Plaintiffs have outlined each attorney's education and experience in their submission to the Court.  (Pl. Br. 20-21).

Each attorney has been approved by other courts in this District at $500 per hour.  (Pl. Br. 21).  *See, e.g., Martinenko* v. *212 Steakhouse, Inc.*, No. 22 Civ. 518 (JLR), 2024 WL 5199792, at *3 (S.D.N.Y. Dec. 23, 2024) (collecting cases and awarding fees at $500 per hour for Mr. Kirschenbaum and Ms. Shulman); *Alexander* v. *DRG Hosp. Grp., Inc.*, No. 23 Civ. 11101 (ER), 2024 WL 4789401, at *2-3 (S.D.N.Y. Nov. 14, 2024) (same); *Dougherty* v. *2With Deli Corp.*, No. 23 Civ. 3496 (ER), 2023 WL 8432866, at *2 (S.D.N.Y. Dec. 5, 2023) (same).  (*See also* Dkt. #126-6 at 17:12-18:22 (Judge Woods approving Mr. Kirschenbaum, Ms. Schulman, and Mr. Nussbaum at $500 per hour at a

31

hearing in *Zivkovic* v. *Laura Christy LLC*, No. 17 Civ. 553 (GHW) (S.D.N.Y. June 15, 2022))).

Defendants have not disputed Class Counsel's requested hourly rates. (*See* Def. Opp. 11 (recognizing the $500 hourly rates but not contesting them)). This Court agrees that $500 per hour is reasonable for Mr. Kirschenbaum, Ms. Schulman, and Mr. Nussbaum, and thus follows its sister courts and approves the three attorneys at that rate.

### b.    Hours Worked

Plaintiffs have submitted time records reflecting their time spent, among other things, (i) drafting multiple letter motions related to Defendants' discovery misconduct and reviewing Court orders related to the same; (ii) communicating with Defense Counsel about continued discovery deficiencies; (iii) meeting with Class Members who were pressured by Defendants' agents to opt out and helping them draft declarations; (iv) preparing for and attending the August 15, 2025 and September 16, 2025 conferences; (v) preparing and submitting a corrective notice to Class Members; and (vi) drafting the instant sanctions motion.  (*See* Dkt. #126-3).  *See Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1183-84 (2d Cir. 1996) (holding that time spent working on a fee application is compensable).

In total, Plaintiffs seek fees for 29.1 hours worked by Mr. Kirschenbaum, 67.6 hours worked by Mr. Nussbaum, and 20.2 hours worked by Ms. Schulman.  (*See* Pl. Br. 22 (seeking fees for 28.2 hours worked by Mr. Kirschenbaum, 62.1 hours worked by Mr. Nussbaum, and 19.4 hours billed by

32

Ms. Schulman); Pl. Reply 2 (seeking addition fees for .9 hours worked by Mr. Kirschenbaum, 5.5 hours worked by Mr. Nussbaum, and .8 worked by Ms. Schulman)).

Defendants argue that Class Counsel have performed "duplicative work[ ]," and they ask the Court to reduce Class Counsel's hours by omitting the same. (Def. Opp. 11). Defendants also argue that Class Counsel have requested reimbursement for work "related to routine case management rather than addressing the actual discovery misconduct." (*Id.* at 12). Finally, Defendants reiterate that the awarded amount "should be substantially reduced as the delays in production of discovery w[ere] not willful and Defendants eventually fulfilled their obligation to complete discovery, although they caused some delay." (*Id.*).

The Court begins by noting that it is cutting all hours worked before and through May 5, 2025, as the Court has declined to impose sanctions for the discovery disputes until after that date. The Court disagrees with Defendants' argument that Class Counsel seeks fees for duplicative work, but it nonetheless will impose a 10% across-the-board reduction on the resulting fee because the Court has questions about whether certain of the work for which Class Counsel seeks fees in fact relates to Defendants' sanctionable conduct. For example, Class Counsel requests fees for general meetings regarding "litigation strategy." (*See, e.g.*, Dkt. #126-3 at 3 (August 4, 2025 Entry)). A 10% deduction thus serves to trim the fat. *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d at 237.

### c.     The Fee Award

Applying rates of $500 for the three lawyers, Plaintiffs seek total fees of $58,450.  (Pl. Reply 2 & n.1 (requesting an award of $56,550 because Defense Counsel already paid $1,900)).  Plaintiffs ask that the Court attribute $1,900 of those fees to Defense Counsel, which amount corresponds to the time incurred in researching and responding to her letter with false citations, and the remaining $56,550 to Defendants.  (Pl. Br. 22; Pl. Reply 2 & n.1).[2]

As explained above, the Court removes all fees claimed for work performed through May 5, 2025, which includes 1.2 hours of work by Mr. Kirschenbaum, 6.7 hours of work by Mr. Nussbaum, and 0.8 hours of work by Ms. Schulman.  That brings Mr. Kirschenbaum's hours down to 27.9, Mr. Nussbaum's to 60.9, and Ms. Schulman's to 19.4.  Applying the relevant hourly rate of $500 yields a total amount of $54,100.  Applying the 10% cut yields a final award of $48,690.  Defense Counsel shall pay $1,710 of that, while Defendants shall pay the remaining $46,980.

### d.     The Costs Award

Defendants also must pay for the costs Class Counsel incurred in purchasing copies of the transcripts of the August 15, 2025 and September 16, 2026 conferences, both of which concerned Defendants' misconduct.  *See, e.g.*, *Doubleline Cap. LP* v. *Odebrecht Fin., Ltd.*, No. 17 Civ. 4576 (GHW) (BCM), 2022

---

[2]     Plaintiffs informed the Court that Defense Counsel sent Class Counsel a check for $1,900 in legal fees attributable to her.  The Court still finds it necessary to clarify here that such fees were sought and awarded in large part, but it recognizes that Defense Counsel has already paid those fees.

WL 3029014, at *13 (S.D.N.Y. July 19, 2022) (ordering the defendants to "pay the reasonable expenses, including … out-of-pocket costs … incurred by plaintiffs in … preparing and pursuing the instant sanctions motion"); *cf. Kosher Sports, Inc.* v. *Queens Ballpark Co., LLC*, No. 10 Civ. 2618 (JBW) (RLM), 2011 WL 3471508, at *14 (E.D.N.Y. Aug. 5, 2011) (ordering sanctions under Rule 37 that included "the costs incurred in … preparing transcripts" of certain depositions).  The Court awards $781.88, which is equal to the total costs. (*See* Dkt. #126-4).[3]

## C.    The Court Imposes a Penalty on Defense Counsel for Submitting False Citations

As part of a sanctions determination, a court may require an attorney to pay a fine to advance the interests of deterrence, but not as punishment or compensation.  *E.g.*, *Universitas Educ., LLC* v. *Nova Grp., Inc.*, 784 F.3d 99, 103-04 (2d Cir. 2015); *Mata* v. *Avianca, Inc.*, 678 F. Supp. 3d 443, 466 (S.D.N.Y. 2023).  In "nearly all cases" where attorneys have submitted AI hallucinated citations, "courts have imposed monetary sanctions ranging from $1,500 to $15,000." *Benjamin* v. *Costco Wholesale Corp.*, 779 F. Supp. 3d 341, 347-48 (E.D.N.Y. 2025) (collecting cases).

As explained above, Defense Counsel admitted to submitting false authority and to misapplying case law.  And while she expressed remorse for her actions, she did not attempt to withdraw or correct her submissions until

---

[3]    Plaintiffs informed the Court that Defense Counsel sent Class Counsel a check for $781.88, corresponding to the amount in costs that Plaintiffs seek.  The Court still finds it necessary to clarify here that such costs were sought and awarded, but it recognizes that Defense Counsel has already paid those costs.

Plaintiffs had already filed their opening sanctions brief.  Consequently, the Court finds it necessary to fashion a penalty that is "sufficient but not more than necessary to advance the goals of specific and general deterrence." *Mata*, 678 F. Supp. 3d at 466.

Here, the Court imposes a penalty of $1,000, which is on the low end of what other courts have imposed in similar circumstances.  This is because the Court recognizes the personal challenges that Defense Counsel was experiencing at the time, and it believes that the remorse she expressed at the September 16, 2025 hearing was genuine.  "Further, it appears that this is the only time [that Defense Counsel] has used an AI platform to replace her own legal judgment." *Benjamin*, 779 F. Supp. 3d at 351 (awarding a monetary sanction of $1,000 after considering this and other factors).  While these circumstances do not excuse Defense Counsel's actions, "they are mitigating factors that lead the Court to conclude that a fine of $1,000 is sufficient." *Id.*

## CONCLUSION

For the reasons explained above, Plaintiffs' motion for sanctions is GRANTED IN PART and DENIED IN PART.  Defendants must pay $46,980 to Class Counsel as reimbursement for attorneys' fees and $781.88 as reimbursement for costs.  Defense Counsel must pay $1,710 to Class Counsel as reimbursement for attorneys' fees.  Finally, the Court imposes a $1,000 penalty on Defense Counsel, to be payable within **30 days** by check or money order to the Clerk of Court of the U.S. District Court for the Southern District of New York.  Defense Counsel may now move to replace its AI-generated

36

submissions.  (*See* Dkt. #135 (denying Defense Counsel's request for the same until after the resolution of Plaintiffs' motion for sanctions)).

The Court recognizes that Class Counsel spent significant time and resources sorting through various messes that Defendants created.  The least the Court can do is to ensure that Defendants pay for the time they forced Class Counsel to spend on those efforts.  The Court also adds that Defendants are fortunate that Plaintiffs have declined to seek the entry of a default judgment, a request which the Court would have considered seriously.  The Court cannot promise that such grace will be extended to Defendants in the event of future missteps.

The Clerk of Court is directed to terminate the pending motion at docket entry 124.

SO ORDERED.

Dated:    May 19, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

37